[Civ. No. 10187.   Second Appellate District, Division One.—January 15, 1936.]

LOUISE G. PARRETT et al., Respondents, v. ARCHIBALD D. CAROTHERS et al., Appellants.

Mathes & Shepard, Robert A. Cushman and Kidd, Schell & Delamer for Appellants.

Newlin & Ashburn, A. W. Ashburn and George W. Tackabury for Respondents.

SHINN, J., *pro tem.*—Appeal by defendants from a judgment after verdict in an action for damages resulting from an automobile collision. Plaintiffs are the heirs at law of Homer C. Parrett, deceased, whose death resulted from a collision between an automobile operated by Warren A. Rix and owned by Lenore V. Rix, and an automobile owned by defendant M. A. Newmark & Co. and being operated by defendant Archibald D. Carothers, with the consent and as the employee of defendant M. A. Newmark & Co., and within the scope of his employment. Upon a verdict of a jury judgment was entered in favor of the plaintiffs, and against the owners and operators of each car, from which judgment all of the defendants appeal.

The Rix car, traveling east upon Cashio Street, approached the intersection of Durango Avenue, and in the intersection struck the Carothers car, which had approached on Durango from the south. The accident occurred about 1 o'clock in the afternoon. Each street is thirty feet wide between curbs. Upon the southwest corner of the intersection was a house which partially obstructed the view of each driver.

The contention of defendants Carothers and M. A. Newmark & Co. that no negligence on the part of Carothers was shown may be briefly disposed of. There was evidence that Carothers approached the intersection at a speed of approximately thirty-five miles per hour, increasing that speed as he neared the intersection, and that he did not slow down before the impact of the two cars. There was also

testimony that he had stated that he did not see the Rix car until he was entering the intersection. There is other testimony that he was driving without due regard to the surrounding conditions and without having his car under control. The undisputed evidence was to the effect that from a distance of seventy-five feet south of Cashio he could have seen westerly on that street for a distance of seventy-five feet, from a point fifty feet south he could have seen eighty-five feet, and from a point twenty-five feet south he could have seen for two blocks to the west. At a speed of fifteen miles per hour he could have stopped his car in about fourteen feet. The point of impact was four or five feet north of the center line of Cashio Street. The jury was justified in finding him negligent in entering the intersection at a high rate of speed and without having made careful observations as to the traffic approaching from other directions. The evidence of the negligence of Carothers is quite sufficient. His contention that any acts of negligence on his part were not the proximate cause of the accident has been resolved against him by the jury, and their conclusion, based upon sufficient evidence, is binding upon this court.

As to the evidence of negligence of defendant Warren A. Rix—this witness testified that he was driving at the rate of about fifteen to eighteen miles per hour as he approached the intersection. There was testimony to the effect that he was driving thirty miles per hour shortly before he reached the intersection. He also testified that he was twenty or thirty feet west of Durango when he first saw the Carothers car and that Parrett called out to him, ''Look out, he is going to hit us. He is going to kill us''; that he saw the Carothers car at just about the time Parrett called out. He testified that the Carothers car, when he first saw it, was seventy or eighty feet south of the intersection and that it was going about thirty-five miles per hour and that he next saw it just as it reached the intersection and that it seemed to speed up after he first saw it and did not slow down at any time. The cars came together with a violent impact. The Rix car was overturned and the Carothers car was shoved sideways to the northeast corner of the intersection, where it knocked down a lamp-post, skidmarks showing that one or both cars skidded about twenty-nine and one-half feet. There was testimony to the effect that skidmarks made by the two cars started eleven

feet east of the west curb line of Durango and upon the north half of Cashio Street. There was testimony that if Rix had been traveling as slowly as fifteen or twenty miles per hour he could have stopped his car within seventeen or twenty-four feet. After he saw the Carothers car he had ample room in which to stop the car before he reached the intersection. Even at twenty-five miles per hour he could have stopped before reaching the point where the impact occurred. It was in evidence also that from a point fifty-five feet west of the westerly curb line of Durango there was an unobstructed view of Durango Avenue to the south for a distance of eighty-five feet. The three other street corners were vacant, affording unobstructed views. There was no evidence of other traffic which might have confused the drivers or diverted their attention from the dangerous southwest corner. This evidence is sufficient to support a finding that defendant Rix was negligent. Or, taking another view of the situation, namely, that the Rix car approached and entered an intersection where the view was partially obstructed at a speed of approximately thirty miles per hour, can it be questioned that this was negligence? Manifestly not. And likewise, where a driver of an automobile sees another car approaching from his right at a speed of thirty-five miles per hour and at a distance of seventy-five or eighty feet from an intersection and under such circumstances that a collision will occur if one car or the other is not slowed down and brought under control in order to allow the other to pass, and the driver does not bring his car under control but proceeds until it is too late to avoid a collision and strikes the approaching car on the side thereof with great force, the finding of a jury that he was guilty of negligence will not be disturbed.

It is contended by appellants Rix that the evidence fails to show wilful misconduct on the part of defendant Warren A. Rix, and that the judgment against them cannot be sustained upon an implied finding of wilful misconduct. With this we agree. It must be conceded, as respondents contend, that the Rix car could have been stopped at a place of safety after Rix had been warned by Parrett of the approach of the Carothers car, but the conduct of each of the drivers was such as is ordinarily encountered in cases where two automobiles come together at an intersection. It is characterized by a failure to appreciate and to guard against

impending danger. It evidences laxity, inattention and a failure to respond to the dictates which control the conduct of careful persons, but it does not bear the earmarks of that deliberate and intentional action, in the face of imminent danger and probable injury, which is essential to establish wilful misconduct. A review of the decisions of the appellate courts of this state, in which the claim of wilful misconduct has been upheld, will disclose that in each case there was present evidence of intentional progress toward impending danger showing a scornful disregard of threatened disaster. Rix did not see the approaching car until he was within twenty-five or thirty feet of the intersection. The one fact that he failed to stop his car within the distance it traveled, forty-three feet, to the point of collision, is not evidence of wilful, intentional wrong. The case clearly falls within the principles recently announced by the Supreme Court in the case of *Meek* v. *Fowler*, 3 Cal. (2d) 420 [45 Pac. (2d) 194].

■ The next point relates to the question of liability of defendants Rix for simple negligence in the operation of the car. Inasmuch as wilful misconduct was not shown, these defendants were not liable for the death of Parrett if the latter was a guest within the purview of the California Vehicle Act, section 141¾. The term "guest" is there defined as "a person who accepts a ride in any vehicle without giving compensation therefor". The argument of respondent upon this branch of the case proceeds upon the theory that Parrett and Rix, as real estate brokers, were engaged in negotiating an exchange of real estate for their principals. A discussion of this point requires a statement of the circumstances under which Rix undertook to transport Parrett to Culver City. Parrett and Rix were real estate brokers. Rix and another broker, as agents, had submitted to Parrett, as agent for one Giroux, business property, known as the Fife property, in exchange for real property owned by Giroux, who had considered the offer and refused to make the offered exchange. Parrett telephoned to Rix about another piece of property, suggesting that the two of them go to see it in connection with the Giroux matter. Rix then made an appointment for Parrett to meet him the following Saturday, the day of the accident, for the purpose of inspecting the property. It was while they were on this mission that the accident occurred. It further appears from statements made by Rix that he ex-

pected to receive a commission from his principal and understood that Parrett would receive one from Giroux in case an exchange should be consummated. The evidence sufficiently shows that the trip to Culver City was for the mutual benefit of the real estate brokers. It was necessary to find a suitable property for Parrett's client Giroux, in order to bring about an exchange by reason of which the brokers would have earned a commission. The property submitted by Rix and Levy had been refused and it was necessary for Rix to have something new to offer. If a satisfactory property should be found, both brokers would profit; otherwise their efforts would have been fruitless. If Parrett placed Rix in touch with the owner of a property which Giroux accepted in exchange for his property, Rix would have profited directly by the assistance of Parrett. The advantage of an opportunity to participate in the negotiations was conferred by Parrett upon Rix when he proposed the inspection of property in Culver City in connection with the ''Giroux matter'', just as it would have been to the advantage of some other broker to be invited into the negotiations by Parrett and to be made acquainted with the Culver City property, with a view to its being offered to Giroux. If the deal had been made, the broker who had been so invited, whether he be Rix or another, would have had Parrett to thank for any remuneration he would have received for his services. There was no social relationship between Parrett and Rix and no intimate friendship. They were interested in doing business together and the trip was being made purely for business reasons. It was not in any sense a pleasure trip.

The distinction between a guest and a passenger, as established by the authorities, may be summarized as follows: A guest is one who takes a ride for his own pleasure or on his own business without making any return to or conferring any benefit upon the driver of the car; one who is rendering value received, in whatever amount, and who gives such recompense for the ride as may be regarded as compensation therefor, that is to say, a return which may make worth while the giving of the ride, is a mere passenger and not a guest. This distinction is substantially declared in the following cases: *Haney* v. *Takakura*, 2 Cal. App. (2d) 1 [37 Pac. (2d) 170]; *Crawford* v. *Foster*, 110 Cal. App. 81 [293 Pac. 841]; *Smith* v. *Fall River etc. District*, 118 Cal. App. 673 [5 Pac.

(2d) 930] ; *Sullivan* v. *Richardson,* 119 Cal. App. 367 [6 Pac. (2d) 567] ; *Sumner* v. *Edmunds,* 130 Cal. App. 770 [21 Pac. (2d) 159]. The conclusion seems to us inescapable that Rix expected to profit by the trip to Culver City. Had the case been otherwise the journey would not have been undertaken. It follows from these views that there was a liability upon the part of Warren A. Rix and consequently upon the part of Lenore V. Rix, the owner of the car which was being driven with her consent, by reason of the negligent manner in which the car was operated. It therefore becomes unnecessary to decide whether the owner of an automobile is liable for the misconduct in the operation thereof of one to whom it is loaned.

It is contended by appellants Rix that the verdict was for an excessive amount, namely, $5,000. These appellants rely in making this point upon the fact that no direct evidence was given as to the earning capacity of the deceased nor as to the amount he contributed to the support of his family. They contend that in the absence of such evidence there was no basis whatever upon which the jury could assess damages and they maintain that the jury should not have been allowed to consider the element of loss of support. Deceased was 65 years of age, his wife 57; there were three children, aged 32 years, 29 years and 27 years, respectively. Mr. and Mrs. Parrett had been married 37 years, during which time they had lived together and raised their family. Mr. Parrett had enjoyed unusually good health all of his life and was in good health on the day of the accident. He had been engaged in the business of real estate broker for something over 18 years; he was industrious and a tireless worker. The entire family was living together at the time of the accident and they had so lived for many years. Mr. Parrett was kind and generous and in all respects a loving and exemplary husband and father. His expectancy of life was 11-10/100ths years. These facts were testified to by one witness, and under stipulation of counsel they must be regarded as having been testified to by all of the members of the family, as it was stipulated that they would so testify if called as witnesses. The contention that the record was without evidence upon which the jury could find that the family of the deceased suffered pecuniary loss by reason of the deprivation of his support is without foundation. It would be strange indeed if any jury

or court would need further facts than those we have related in order to reach a conclusion that the family of the deceased had been supported by his earnings and would have been supported in the future to the extent of his ability. A court or jury could not justly disregard the undisputed evidence as to the relationship of the deceased toward the members of his family and household and the reasonable and natural inferences to be drawn therefrom. But one conclusion could reasonably be reached, namely, that he had been able to fulfill and had fulfilled the natural and legal obligations of a husband and father and that those conditions would have been continued, but for his untimely death. It may properly be recalled that this event occurred while he was actively engaged in following an occupation to which he had devoted the last eighteen years of his life. The views we have expressed upon this point find support in the following cases: *Storrs* v. *Los Angeles Traction Co.*, 134 Cal. 91 [66 Pac. 72]; *Worden* v. *Central Fireproof Bldg. Co.*, 172 Cal. 94 [155 Pac. 839]; *Evarts* v. *Santa Barbara etc. Ry. Co.*, 3 Cal. App. 712 [86 Pac. 830]; *Washington* v. *Pacific Elec. Ry. Co.*, 14 Cal. App. 685 [112 Pac. 904]; *Duffield* v. *Payne*, 66 Cal. App. 767 [227 Pac. 217]; *Holmes* v. *California Crushed Fruit Co.*, 69 Cal. App. 779 [232 Pac. 178].

All of the appellants complain of many of the instructions given at the request of plaintiffs. The arguments in the briefs are extensive. The jury was fully instructed. If there were errors in any of the instructions they did not go so far as to misstate any of the vital, fundamental principles of law by which the jury was to be guided in arriving at its verdict.

■ Only one of the instructions given requires discussion. The jury was instructed that it was unlawful for a vehicle to be driven at a greater speed than twenty-five miles per hour in a business district or at a greater speed than fifteen miles per hour across an obstructed intersection, both speeds being applicable to the place of the accident. This instruction, in our opinion, should not have been given. If the jury was to be instructed in the matter of speed the full purport of the statute should have been stated. In criminal cases, speeds in excess of those prescribed by the California Vehicle Act are, by the terms of the act (sec. 113c), *prima facie*, but not conclusively, unlawful. Nor are the speeds prescribed

lawful under all circumstances. While the instruction very properly did not declare that higher speeds were, in themselves, evidence of negligence, it might well be questioned whether the jury was certain in distinguishing between that speed which, by the court, was declared to be unlawful and that which was negligent. As the jury had been properly instructed that one operating a motor vehicle has a right to assume that others using the highways will observe the law, the instruction in question would have been understood, as though it had so specifically stated, that each driver had a right to assume that others driving in that district would not travel faster than twenty-five miles per hour and would not traverse the intersection in question faster than fifteen miles per hour. But in the same connection the jury was also instructed that one has no right to act upon such assumption after he has knowledge, or by the use of reasonable diligence should know, that the law is not being observed. There was no evidence that either driver acted upon this assumption, nor can such an inference reasonably be drawn. Upon the contrary, each was aware, or believed, when he first viewed the other car, that a greater speed than twenty-five miles per hour was being maintained. Neither from the testimony nor from the actions of the drivers can it be said that either believed, or had reason to believe, that the other was about to, or would, retard his speed before reaching the intersection. The matter of reliance upon the assumption that the other driver would slow down, important as it may be in cases where such reliance is proven or properly may be inferred, as applied to the facts of this case, is purely an abstract principle of law, which manifestly did not influence the conduct of either operator. We are of the opinion that the giving of this erroneous instruction did not mislead the jury in its consideration of the facts of the case, and we cannot say that a different verdict would probably have been reached had the instruction not been given. We are unable to say that any other instruction, of which appellants complain, led to an unjust or erroneous verdict against any or either of the defendants. We have stated the substance of the evidence in the case quite fully, because we are of the opinion that the negligence of each driver was firmly established. Each testified that his own speed was around fifteen miles per hour, and that of the other around thirty. If both cars had been travel-

ing slowly there would have been no accident, or, at most, a minor one. The physical evidence of a collision of great violence, the fact that each car proceeded up to the point of impact with little or no diminution of speed, and the fact that nothing approaching adequate care was exercised by either driver to observe traffic approaching the intersection, all point strongly toward the conclusion that each driver proceeded into the intersection at a rate of speed, and with a degree of inattention to his surroundings that, under the circumstances, was nothing short of reckless.

"For a reversal to be ordered on account of errors committed in the giving or refusing of instructions to the jury, it must affirmatively appear, and the court must affirmatively be of the opinion that there has been a miscarriage of justice." (*Haney* v. *Takakura, supra.*) Applying this rule to the present case, we must affirm the judgment.

The judgment is affirmed.

Houser, P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 10, 1936, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 12, 1936.